1  DAVID I. DALBY SBN: 114750
   HINSHAW & CULBERTSON LLP
2  One California Street, 18th Floor
   San Francisco, CA 94111
3  Telephone:  415-362-6000
   Facsimile:   415-834-9070
4  ddalby@hinshawlaw.com
   Attorneys for Defendant
5  SIOUX HONEY ASSOCIATION,
   COOPERATIVE

6

7

8               **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA,**

10                  **SOUTHERN DIVISION**

11  SUSAN TRAN, on Behalf of Herself and )   Case No. 8:17-CV-00110-JLS-JCG
    all Others Similarly Situated,            )
12                                            )   **SIOUX HONEY ASSOCIATION,**
                                              )   **COOPERATIVE'S MEMORANDUM**
13              Plaintiff,                     )   **OF POINTS AND AUTHORITIES IN**
                                              )   **SUPPORT OF MOTION TO DISMISS**
14       vs.                                  )   **[F.R.C.P. RULE 12(b)(1),(6)**
                                              )
15  SIOUX HONEY ASSOCIATION,              )   **Date:  April 21, 2017**
    COOPERATIVE,                              )   **Time:  2:30 p.m.**
16                                            )   **Courtroom:  10A, 10th floor**
                Defendant.                     )   **Judge: Hon. Josephine L. Staton**
17                                            )
                                              )   Complaint Filed:  January 23, 2017
18                                            )
                                              )
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................ 1

II.  SUMMARY OF PLAINTIFF'S ALLEGATIONS AND SHA'S
POSITION ................................................................................................. 1

    A.  The Allegations of the Complaint .................................................... 1

III.  PLAINTIFF'S CLAIMS ARE PREEMPTED ......................................... 3

    A.  SHA's Labeling of Sioux Bee Honey Complies with Federal Law .......... 4

    B.  Federal Law Does Not Require the Disclosure of Glyphosate
Residue ............................................................................................. 6

IV.  THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS UNDER
THE CLRA, FAL AND UCL BECAUSE DEFENDANT'S USE OF
THE WORDS "100% ALL-NATURAL," "100% PURE" ARE NOT
OBJECTIVELY DECEPTIVE TO CONSUMERS ..................................... 8

    A.  SHA's Use of "100% All-Natural" is Not Objectively Deceptive ............ 9

    B.  SHA's Use of "100% Pure" is Not Objectively Deceptive to
Consumers ........................................................................................ 15

    C.  Plaintiff's Claims Are Barred By The Safe Harbor Rule .................. 17

V.  THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS BECAUSE
PLAINTIFF LACKS STANDING ......................................................... 18

    A.  The Court Should Dismiss Plaintiff's Purported "Failure to Warn"
Claim for Lack of Standing ............................................................. 19

    B.  The Court Should Dismiss Plaintiff's Claims as She Has No Injury ...... 20

VI.   THE COURT SHOULD DISMISS THE COMPLAINT IN ITS
      ENTIRETY, OR AT THE LEAST STAY THIS ACTION, UNDER THE
      DOCTRINE OF PRIMARY JURISDICTION BECAUSE THE FDA IS
      IN THE PROCESS OF PROMULGATING A DEFINITION OF
      "NATURAL" ...............................................................................................22

VII.  CONCLUSION ............................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allen v. Hylands Inc.*,
   300 F.R.D. 643 (C.D. Cal. 2014)..................................................... 13

*Alvarez v. Chevron Corp.*,
   656 F.3d 925 (9th Cir.2011) .......................................................... 18

*Anderson v. Hain Celestial Group, Inc.*
   No. 5:14-cv-3895, ECF No. 62 ..................................................... 24

*Astiana v. Dreyer's Grand Ice Cream, Inc.*,
   2012 WL 2990766,(N.D.Cal.)........................................................ 17

*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) ................................................... 23, 24

*Astiana v. Kashi Co.*,
   No. 3:11-CV-01967-H(BGS), 2013 WL 3943265 (S.D. Cal. July 30,
   2013).......................................................................... 12, 14, 24

*Backus v. Gen. Mills, Inc.*,
   No. 15-cv-01964-TEH, 2015 WL 4932687 (N.D. Cal. Aug. 19, 2015) ................ 24

*Barber v. Nestle USA, Inc.*,
   154 F.Supp.3d 954, 959-962 (2015)................................................. 18

*Baron v. Pfizer, Inc.*,
   42 A.D.3d 627, 840 N.Y.S.2d 445 (3d Dep't 2007) ............................... 21

*In re Bisphenol–A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
   No. 08-1967, 2009 WL 3762965 (W.D. Mo. Nov. 9, 2009)......................... 7

*Boysen v. Walgreen Co.*,
   No. C 11-06262, 2012 WL 2953069 (N.D. Cal. July 19, 2012) ..................... 19

*Brockey v. Moore*,
   107 Cal.App.4th 86, 131 Cal.Rptr.2d 746 (2003) ................................ 9

*Brod v. Sioux Honey Association, Cooperative*,
   895 Supp. 2d 972 (ND Cal. Sept. 11, 2012)................................... 5, 16

*Buckland v. Threshold Enterprises, Ltd.*,
    155 Cal.App.4th 798 (2007) ................................................................. 19

*C.W. v. Textron*,
    No. 3:10 CV-87 PPS, 2014 WL 1047940 (N.D. Ind. March 17, 2014) ................. 20

*Cardona v. Target Corp.*,
    No. 12–CV–1148, 2013 WL 1181963 (C.D. Cal. Mar. 20, 2013) ....................... 16

*Cel-Tech Commc'ns.Inc. v. Los Angeles Cellular TelephoneCompany*,
    20 Cal. 4th 163 (1999) ................................................................. 17

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ................................................................. 19

*Clark v. Time Warner Cable*,
    523 F.3d 1110 (9th Cir. 2008) ......................................................... 24

*Coyle v. Hornell Brewing Co.*,
    Civil No. 08-02797 (JBS), 2010 WL 2539386 (D.N.J. June 15, 2010) ........... 22, 23

*Ebner v. Fresh Inc.*, No. SACV 13–00477 JVS(RNBx), 2013 WL
    9760035, at *1, *5 (C.D.Cal. Sep. 11, 2013) ......................................... 18

*Ellis v. Tribune Television Co.*,
    443 F.3d 71 (2d Cir. 2006) ............................................................. 22

*Gallagher v. Chipotle Mexican Grill, Inc.*,
    15-CV-3952, 2016 WL 454083 (N.D. Cal. Feb. 5, 2016) ............................. 16

*Gitson v. Clover-Stornetta Farms, Inc.*,
    No. C-13-01517(EDL), 2014 WL 2638203 (N.D. Cal. June 9, 2014) ................ 24

*Gubala v. CVS Pharmacy, Inc.*,
    No. 14 C 9039, 2015 WL 3777627 (N.D. Ill. June 16, 2015) ........................... 8

*Hall v. Time Inc.*,
    158 Cal.App.4th 847 (2008) ............................................................ 18

*Hill v. Roll International Corp.*,
    195 Cal.App.4th 1295, 128 Cal.Rptr.3d 109 (2011) .................................... 9

*In re Pepsi Co., Inc. Bottled Water Marketing & Sales Practices
    Litigation*, 588 ...................................................................... 4

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 8:17-CV-00110-JLS-JCG

*Izequierdo v. Mondelez International, Inc.*,
    16-CV-4697, 2016 WL 6459832 (S.D.N.Y. Oct. 26, 2016) ................................... 21

*Kane v. Chobani*,
    645 Fed. Appx. (9th Cir. 2016) ..................................................... 24

*Koronthaly v. L'Oreal USA, Inc.*,
    374 F. App'x 257 (3d Cir. 2010) ................................................... 19

*Lavie v. Procter & Gamble Co.*,
    105 Cal.App.4th 496, 129 Cal.Rptr.2d 486 (2003) ..................................... 9

*Leonard v. Abbott Laboratories, Inc.*,
    No. 10-CV-4676, 2012 WL 764199 (E.D.N.Y. Mar. 5, 2012) ............................ 13

*Lieberson v. Johnson & Johnson Consumer Co.*,
    865 F. Supp. 2d 529 (D. N.J. 2011) .................................................. 21

*Loeffler v. Target Corp.*,
    58 Cal.4th 1081 (2014) .............................................................. 18

*Lopez v. Nissan N. Am., Inc.*,
    201 Cal.App.4th 572, 135 Cal.Rptr.3d 116 ........................................... 18

*Madrid v. Perot Systems Corp.*,
    130 Cal.App.4th 440 (2005) ......................................................... 18

*Oxina v. Land's End, Inc.*,
    2015 WL 4272058 (S.D. Cal. Jun. 19, 2015) .......................................... 18

*Pelayo v. Nestle USA, Inc.*,
    989 F. Supp. 2d 973 (C.D. Cal. 2013) ............................................... 13

*In re PepsiCo*,
    588 F. Supp. 2d at 539 .............................................................. 8

*Pom Wonderful LLC v. Coca Cola Co.*, No. CV 08–06237 SJO(FMOx),
    2013 WL 543361, at *5 (C.D.Cal. Apr. 16, 2013) .................................... 18

*Red v. Gen. Mills, Inc.*,
    No. 2:15-cv-02232, 2015 WL 9484398 (C.D. Cal. Dec. 29, 2015) ....................... 24

*Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*,
    290 F.3d 1055 (9th Cir. 2002) ...................................................... 18

*Rivera v. Wyeth-Ayerst Labs,*
 283 F.3d 315 (5th Cir. 2002) ........................................................ 20

*Rubin v. Green,*
 4 Cal. 4th 1187 (1993) ............................................................... 17

*Saubers v. Kashi Co.,*
 39 F. Supp. 3d 1108, 1112-13 (S.D. Cal. 2014) ........................... 24

*Scholder v. Erbo North America, and New World Pasta Co.,*
 No. 16-cv-06002-ADS-AKT (E.D.N.Y.) (Oct. 28, 2016) ............. 25

*Scholder v. Topco Holdings, Inc.,*
 No. 2:16-cv-06028-LDW-GRB (E.D.N.Y.) (Oct. 31, 2016) ......... 25

*Small v. Lorillard Tobacco Co.,*
 94 N.Y.2d at 56 ......................................................................... 20

*Smedt v. The Hain Celestial Group, Inc.,*
 No. 5:12-CV-03029-EJD, 2014 WL 2466881 (N.D. Cal. May 30,
 2014) ......................................................................................... 24

*Spokeo, Inc. v. Robins,*
 136 S. Ct. 1540 (2016) .............................................................. 18

*Swearingen v. Healthy Beverage LLC,*
 No. C-13-4835 EMC, 2014 WL 2696719 (N.D. Cal. June 11, 2014) ............... 24

*Syntek Semiconductor Co. v. Microchip Tech. Inc.,*
 307 F.3d 775 (9th Cir. 2002) ..................................................... 23

*Taradejna v. Gen. Mills, Inc.,*
 909 F. Supp. 2d 1128 (D. Minn. 2012) ...................................... 23

*Turek v. General Mills, Inc.,*
 62 Fed. 3rd 423 (7th Cir. 2011) ................................................... 5

*Verzani v. Costco Wholesale Corp.,*
 No. 09CIV2017 (CM), 2010 WL 3911499 (SDNY Sep. 28, 2010), aff. ............... 4-5

*Viggiano v. Johnson & Johnson,*
 No. 2:14-cv-7250, ECF No. 55 (C.D. June 21, 2016) .................. 24

*Wachovia Bank, N.A. v. Burke,*
    414 Fed. 3rd 305, 313-14 (2d Cir. 2005), *cert. denied*, 127 S. Ct. 2093
    (2007) .................................................................................................. 4

*Walker v. B&B Foods, Inc.,*
    No. 15-cv-03772, 2016 WL 463253 (N.D. Cal. Feb. 8, 2016) ............................ 24

*Weiner v. Snapple Beverage Corp.,*
    No. 07 Civ. 8742(DLC), 2011 WL 196930 (S.D.N.Y. Jan. 21, 2011) ................ 21

*In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.,*
    15 Civ. 5838 (PAE), 2016 WL 852796 (S.D.N.Y. Mar. 1, 2016) ...................... 19

*Williams v. Gerber Prods. Co.,*
    552 F.3d 934 (9th Cir.2008) ............................................................... 9

**Statutes**

21 U.S.C.
    § 341 *et seq.* .................................................................................. 4
    § 342(a)(2)(B) ................................................................................ 6
    § 343(a)(1) ..................................................................................... 5
    § 343(i) ........................................................................................... 5
    § 343(i)(1) ..................................................................................... 17
    § 343(i)(2) ..................................................................................... 5
    § 343-1(a) ....................................................................................... 4

Cal. Ag. Code
    § 29413 .......................................................................................... 15
    § 29413(a) ...................................................................................... 17
    § 29416 .......................................................................................... 17
    § 29451 .......................................................................................... 17
    § 29677 .......................................................................................... 17

Cal. Bus. & Prof. Code
    § 17200 ............................................................................. 1, 8, 17, 18
    § 17500 ............................................................................................. 8

Cal. Civ.Code
    § 1770 ............................................................................................... 8

Cal. Health & Safety Code
    § 110100(a) .................................................................................... 17

**Other Authorities**

7 C.F.R.
    § 205.671 ................................................................................................ 14

21 C.F.R.
    § 10.25(b)................................................................................................ 22

40 C.F.R.
    § 180.364 .................................................................................................. 7

48 Fed. Reg. 23,270 (May 24, 1983)........................................................... 12

58 Fed. Reg. 2,407 (Jan. 6, 1993)................................................................ 12

62 Fed. Reg. at 17,725-26 (Apr. 11, 1997).............................................. 6, 7

75 Fed. Reg at 63,586 (Oct. 15, 2010) ........................................................ 12

80 Fed. Reg. 69,905 (Nov. 12, 2015) .......................................................... 22

80 Fed. Reg. 69,905-06 (Nov. 12, 2015) ..................................................... 12

**Rules**

Fed. R. Civ. Proc.,
    Rule 12(b)(1) ....................................................................................... 1, 3
    Rule 12(b)(6) ....................................................................................... 1, 3

## I.    INTRODUCTION

Pursuant to Federal Rules of Civil Procedure, Rules 12(b)(1) and (6), defendant Sioux Honey Association, Cooperative, ("SHA") moves to dismiss the complaint of Plaintiff Susan Tran ("Plaintiff") on the grounds that Plaintiff's complaint is barred by federal preemption, each cause of action fails to state a cause of action on which relief can be granted, and the action should be dismissed based on the doctrine of Primary Jurisdiction.  As the sole basis for Plaintiff's complaint is the allegation that the label on SHA's honey, which describes the honey as 100% natural, is misleading, federal labeling law preempts this claim and bars Plaintiff's action.  Furthermore, the causes of action of the complaint fail under the Unfair Competition Law, Cal. Business & Professions Code section 17200, ("UCL"), The California Legal Remedies Act ("CLRA") and the California False Advertising Law ("CFAL") because the label on SHA's honey describing the product as "Pure," "100% Pure," and/or "Natural" are not misleading.  Finally, this action should be dismissed, or at least stayed under the doctrine of Primary Jurisdiction as the Federal Drug Administration is in the process of promulgating regulations concerning the definition of natural.

## II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS AND SHA'S POSITION

### A.    The Allegations of the Complaint

Plaintiff alleges that SHA's label, which describes the honey as "pure," "100% pure," and/or "natural" and describes the honey as "100% pure, all natural American honey," is false, deceptive and misleading.  (Comp. ¶¶ 3-4.)  Plaintiff alleges that because SHA's honey contains an infinitesimal trace of the herbicide glyphosate measured in parts per billion, that is picked up by bees in the process of manufacturing honey, SHA cannot legally label its honey as "Pure," "100% Pure," "Natural," or "All Natural," because of the trace existence of glyphosate.  (Comp. ¶¶ 5-10.)  Plaintiff alleges that because of SHA's label, Plaintiff and the members of a purported class purchased SHA honey because they were deceived into believing that SHA honey was "Pure," "100% Pure," "Natural," or "All Natural."  Plaintiff alleges that SHA's labels

1  were a violation of the CLRA, the UCL, and the FAL.  Allegedly, Plaintiff "purchased

2  Sue Bee products approximately once every month" since June, 2013, but Plaintiff

3  does not identify the particular SHA honey products she purchased. (Comp. ¶ 21.)

4          Glyphosate is legal and one of the most widely produced herbicides.  (Comp.

5  ¶ 44.)  Plaintiff does not allege that glyphosate residue allegedly found in Sioux Bee

6  Honey is illegal.  Rather, she drones on that in her personal view, the detection of

7  miniscule trace amounts renders the honey incapable of being labeled "Pure," "100%

8  Pure," "Natural," or "All Natural," because of the presence of trace elements of

9  glyphosate.  (Comp. ¶¶ 56-81.)  Plaintiff alleges that she has health fears that have not

10  materialized and she paid more for SHA's honey than she otherwise would have.

11  (Comp. ¶¶ 13, 15, 48-53, 71, 84-87, 95-96.)

12          Significantly, Plaintiff does not allege that SHA itself adds glyphosate to its

13  honey or that glyphosate is actually an ingredient of honey or that any alleged

14  infinitesimal trace of glyphosate that might be found in honey is the result of anything

15  other than the "natural" process of bees gathering nectar.

16      **B.      SHA's Label Complies With Federal Law and Is Not Deceptive**

17          Plaintiff's claims are meritless.  SHA honey contains one ingredient – 100%

18  natural and pure honey – and SHA's labels Sioux Bee Honey as "100% all natural"

19  and "100% pure" because that is what it is.  The labels are accurate and truthful.

20  Moreover, the labels comply with the governing federal regulatory regime of the U.S.

21  agricultural and food sectors, which Plaintiff attempts, improperly, to circumvent

22  through state law causes of action.  The federal regulatory authorities, namely, the

23  Food & Drug Administration ("FDA"), the Federal Trade Commission ("FTC"), the

24  United States Department of Agriculture ("USDA"), and the Environmental

25  Protection Agency ("EPA"), collectively have:  (1) determined that glyphosate is non-

26  toxic to humans and lawfully used on crops; (2) characterized the presence of

27  glyphosate residue as a "tolerance" not "ingredient" that has to be listed as such; and

28  (3) allow food companies to advertise products as "natural" even if those products

2

1   were treated with herbicides or pesticides.  SHA demonstrates below that all of

2   Plaintiff's causes of action should be dismissed, pursuant to Rules 12(b)(1) and (b)(6),

3   on the basis of federal preemption, the doctrine of Primary Jurisdiction, lack of

4   standing, and failure to state a claim.

5        SHA is a member-owned marketing cooperative with over 309 members from

6   24 states, Canada, and Mexico, who market their honey worldwide through SHA.

7   SHA labels Sioux Bee Honey as "100% All Natural" and "100% Pure" because that is

8   what it is; its labels inform consumers that Sioux Bee Honey is 100% pure and

9   natural, is derived from honey bees, is unadulterated, and free from dilution with other

10  sweeteners.  Importantly, in combing through Plaintiff's complaint, Plaintiff does not

11  allege that SHA itself adds anything to Sioux Bee Honey.  In fact, Plaintiff does not

12  allege what would account for the presence of glyphosate in SHA's honey, except that

13  Plaintiff concedes that glyphosate has been measured at the virtually nonexistent level

14  of 41 parts per billion.  (Comp. ¶ 41.)  However, to the extent there are any

15  microscopic trace amounts of glyphosate in Sioux Bee Honey, they are there because

16  the honey bees, in doing what they do naturally – gathering nectar – may have

17  encountered a flower or plant that has been treated with glyphosate and brought the

18  glyphosate back to the hives where the bees turn their nectar into honey.  Even if it is

19  true that there are miniscule trace amounts of glyphosate in some jars of Sue Bee

20  Honey, that does not prevent the honey from being "natural" or "pure" so long as

21  SHA is not adding glyphosate to the honey after the honey is made by the bees and the

22  only reason the miniscule trace amounts of glyphosate are in the honey is because it

23  was picked up by the honey bees as part of a natural process.

24  ## III.   PLAINTIFF'S CLAIMS ARE PREEMPTED

25       Plaintiff wrongfully asks this court to find that SHA was required, under state

26  law, to disclose the alleged presence of trace amounts of glyphosate because

27  (1) consumption of glyphosate at those levels allegedly poses a risk to human health

28  (Comp. ¶¶ 5, 48-53, 84(g).), and (2) Plaintiff did not receive what she paid for.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 8:17-CV-00110-JLS-JCG

1   (Comp. ¶¶ 13, 15, 71, 84-87, 95-96.)  Federal law, however, preempts any such a

2   disclosure requirement because (1) federal law expressly preempts any state law from

3   directly or indirectly requiring, as Plaintiff suggests, that glyphosate be listed as an

4   "ingredient" on food labels; and (2) neither the FDA nor Congress has ever required

5   the disclosure of glyphosate residue in food products at such a low level.

6       **A.    SHA's Labeling of Sioux Bee Honey Complies with Federal Law**

7           Preemption generally occurs in one of three ways:  (a) "where congress has

8   expressly preempted state law"; (b) "where congress has legislated so

9   comprehensively that federal law occupies an entire field of regulation and leaves no

10  room for state law"; or (c) "where federal law conflicts with state law" or "state law

11  stands as an obstacle to the accomplishment and execution of the full purposes and

12  objectives of Congress." *Wachovia Bank, N.A. v. Burke*, 414 Fed. 3rd 305, 313-14

13  (2d Cir. 2005) (citations omitted), *cert. denied*, 127 S. Ct. 2093 (2007).

14          Here, Plaintiff's claims are expressly preempted by the Food, Drug and

15  Cosmetic Act ("FDCA"), as amended by the Nutritional Labeling Act ("NLEA"), 21

16  U.S.C. section 341 *et seq.*, which contains an express preemption clause which

17  broadly states that "no state or political subdivision of a state may directly or

18  indirectly establish under any authority…any requirement for the labeling of

19  food…that is not identical to" corresponding federal laws.  21 U.S.C. section

20  343-1(a).

21          Thus, state law cannot impose [food labeling] obligations beyond, or different

22  from, what federal [law] requires." *In re Pepsi Co., Inc. Bottled Water Marketing &*

23  *Sales Practices Litigation*, 588 Fed. Supp 2d 527, 532 (SDNY 2008) (enforcing the

24  express preemption provisions set forth in section 343-1(a) of the NLEA in food

25  labeling cases involving bottled water); *accord Verzani v. Costco Wholesale Corp.*,

26  No. 09CIV2017 (CM), 2010 WL 3911499, at *3 (SDNY Sep. 28, 2010) (where "true

27  purpose is to privately enforce alleged violations of the FDCA," state law claims for

28  "unfair and deceptive business practices" are barred), aff.'d 432 F. App'x 29 (2d Cir.

4

1  2011).

2         The NLEA's broad preemption provision is consistent with Congress' intent to

3  create uniform national standards regarding the labeling of food and to prevent states

4  from adopting inconsistent food labeling requirements.  As Judge Posner stated in

5  *Turek v. General Mills, Inc.*, 62 Fed. 3rd 423 (7th Cir. 2011):

6         It is easy to see why Congress would not want to allow states to impose
       disclosure requirements of their own on packaged food products, most of
7       which are sold nationwide.  *Manufacturers might have to print 50
       different labels, driving consumers who buy products in more than one
8       state, crazy.*

9  *Id.* at 426 (emphasis added).

10        The many subsections of NLEA establish the conditions under which food is

11  considered "misbranded."  Generally, food is misbranded under the NLEA if "its

12  labeling is false or misleading in any particular." 21 U.S.C. section 343(a)(1).  Of

13  relevance here, the applicable provision of the NLEA provides that one must either

14  label a product by its "common or usual name" or, if it is a product "fabricated from

15  two or more ingredients," by the common or usual names of each ingredient.  21

16  U.S.C. section 343(i).  A food that is fabricated from two or more ingredients must

17  disclose the common or usual names of the characterizing components or ingredients

18  by their percentages and the label must note the presence or absence of such

19  ingredient.  SHA's labeling of Sioux Bee Honey, which is made from nothing other

20  than honey, complies with the FDCA and the NLEA requirements because Sioux Bee

21  Honey is not "fabricated from" glyphosate.  21 U.S.C. section 343(i)(2).  Honey is a

22  single ingredient food.  Bees make the honey and SHA merely filters out the

23  impurities and markets the honey.  *Brod v. Sioux Honey Association, Cooperative*,

24  895 Supp. 2d 972, 980-981 (ND Cal. Sept. 11, 2012) (holding that the "common or

25  usual name" under the NLEA, is "honey" regardless of the absence of pollen, and

26  state cannot ban the use of the label "honey" for products which are commonly and

27  usually called "Honey.").

28

1  **B.    Federal Law Does Not Require the Disclosure of Glyphosate Residue**

2      The FDA and the EPA are responsible for regulating the use of herbicides, such

3  as glyphosate, on food products.  These herbicide tolerances are established as a result

4  of their registration with the EPA.  In that process, a chemical company applies for a

5  registration to use a specific chemical on a specific matrix in specific settings based

6  upon the proper application of herbicides to foods to ensure their effectiveness to

7  remove pests and safety from exposure.  The EPA then reviews requests and approves

8  the use of herbicides and establishes the maximum amounts of residues permitted in

9  food products.  The FDA then enforces the tolerance levels set by the EPA.  *See* FDA,

10  Compliance Policy Guide Sec. 575.100 Pesticide Residues in Food and Feed –

11  Enforcement Criteria (Mar. 20, 2015) (Exhibit A to SHA's Request for Judicial Notice

12  ("RJN")); 21 U.S.C. § 342(a)(2)(B).  Both agencies consider trace amounts of

13  glyphosate to be safe for human consumption.  In 1986, following a scientific review

14  of glyphosate by the EPA, the EPA "concluded that the chronic dietary risk posed by

15  glyphosate food uses is minimal."  *See* EPA, Reregistration Eligibility Decision

16  Document (R.E.D.) Facts, Glyphosate, at 3, Dkt. No. EPA-738-F-93-011 (Sept. 1993)

17  (RJN Ex. B).  It found that the evidence showed that glyphosate does not pose a

18  cancer risk for humans.  *Id.*  The EPA is currently conducting its periodic registration

19  review of glyphosate, and on September 22, 2016, its Office of Pesticide Programs

20  published a report suggesting that the agency determine, again, that glyphosate is not

21  likely to be carcinogenic to humans at doses relevant to human consumption.  *See*

22  EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of

23  Carcinogenic Potential, at 141 (Sept. 12, 2016) (RJN Ex. C).

24      Neither the FDA nor the EPA has ever required that food containing glyphosate

25  bear a disclosure or warning label.  To the contrary, the FDA and the EPA have

26  approved its presence on a wide range of food products.  *See* 62 Fed. Reg. at 17,725-

27  26 (Apr. 11, 1997).  As an example, the FDA and EPA have approved the presence of

28  glyphosate in grains in quantities up to 30 ppm and in beets in quantities up to 25

1  ppm. 40 C.F.R. § 180.364.  While the FDA has not listed a tolerance for glyphosate in

2  honey, there is good reason for that, in that glyphosate was never intended to be used

3  on honey.  *See* Julie Fidler, Uh Oh:  FDA Finds Glyphosate Herbicide in U.S. Honey,

4  NATURAL SOCIETY (Sept. 20, 2016), http://naturalsociety.com/fda-glyphosate-us-

5  honey-1847/ (citing to E-Mail from Chris Sack to Narong Chamkasem, Ph.D., dated

6  January 8, 2016).

7         While the Plaintiff cites to the International Agency for Research on Cancer

8  ("IARC") report which dubbed glyphosate as "probably carcinogenic" (Comp. ¶ 48.)

9  in May 2016, a report by the World Health Organization ("WHO") and the U.N.

10 concluded it "is unlikely to be genotoxic at anticipated dietary exposures."  *See* Joint

11 FAO/WHO Meeting on Pesticide Residues Summary Report at 2 (May 16, 2016)

12 (RJN Ex. D).  In fact, the EPA has expressly concluded that "[t]here is no concern for

13 acute effects due to dietary exposure to glyphosate" and that "there is reasonable

14 certainty that no harm will occur from aggregate exposure to glyphosate" at levels

15 below 30 parts per million.  *See* 62 Fed. Reg. at 17,725-26 (Apr. 11, 1997).  Here,

16 FDA testing showed, and Plaintiff concedes (Comp. ¶ 41.), that an unspecified variety

17 of Sue Bee Honey contained 41 parts *per billion* of glyphosate, or .041 parts per

18 million.  *See* Fidler, Uh Oh:  FDA Finds Glyphosate Herbicide in U.S. Honey.  This

19 miniscule amount is equal to 41 pinches of salt in 10 tons of potato chips, or 41

20 seconds in nearly 32 years.  And, importantly, it is far below (an alleged presence

21 1000 times more diffuse than) the 30 parts *per million* allowances expressed by the

22 EPA.

23        State law, *via* a private civil consumer fraud claim, cannot impose labeling

24 requirements based on a finding to the contrary.  "To rule otherwise would permit a

25 state to impose almost any requirement on food labeling that conceivably could

26 concern food safety, a result Congress surely did not intend."  *In re Bisphenol–A*

27 *(BPA) Polycarbonate Plastic Prods. Liab. Litig.*, No. 08-1967, 2009 WL 3762965, at

28 *6 (W.D. Mo. Nov. 9, 2009).

7

1   Therefore, Plaintiff's claims that state law imposes a duty to warn about

2 glyphosate *via* labeling are preempted because, if accepted, they would improperly

3 establish requirements for labeling of food which are not identical to the requirements

4 of federal regulations, and outside the EPA's and FDA's established process for such

5 tolerances. *See Gubala v. CVS Pharmacy, Inc.*, No. 14 C 9039, 2015 WL 3777627, at

6 *3 (N.D. Ill. June 16, 2015); *In re PepsiCo*, 588 F. Supp. 2d at 539.  Accordingly, the

7 Court should dismiss the Complaint in its entirety because, for these reasons,

8 Plaintiff's claims are preempted.

9
10   **IV.   THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS UNDER THE CLRA, FAL AND UCL BECAUSE DEFENDANT'S USE OF THE WORDS "100% ALL-NATURAL," "100% PURE" ARE NOT OBJECTIVELY DECEPTIVE TO CONSUMERS**
11

12   Plaintiff claims that SHA's labeling of its Sue Bee Honey as "100% All-

13 Natural" and "100% Pure" is deceptive and in violation of CLRA, FAL and UCL.

14 However, SHA labels its Sue Bee Honey as "100% All-Natural," and "100% Pure"

15 because that is what they are.  They are the natural product of the honey bee, *i.e.,*

16 honey.  SHA labels its Sue Bee Honey in this manner to inform consumers that its

17 product is 100% pure and natural honey derived from honey bees and is unadulterated

18 and free from dilution with other sweeteners.  Plaintiff's conclusory assertions that

19 these statements were deceptive, however, are neither objectively nor "plausibly"

20 deceptive under the facts of the Complaint.

21   The CLRA, FAL and UCL, the basis of Plaintiff's three causes of action, are

22 California consumer protection statutes.  The UCL makes actionable any "unlawful,

23 unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200. The

24 CLRA also prohibits "unfair methods of competition and unfair or deceptive acts or

25 practices."  Cal. Civ.Code § 1770.  The false advertising law prohibits any "unfair,

26 deceptive, untrue, or misleading advertising."  Cal. Bus. & Prof. Code § 17500.

27 Claims made under these statutes are governed by the "reasonable consumer" test

28 which focuses on whether "members of the public are likely to be deceived."

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
Case No. 8:17-CV-00110-JLS-JCG

1  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir.2008) (holding that claims

2  under UCL, CLRA, and FAL "are governed by the 'reasonable consumer' test")

3  (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995)).  The reasonable

4  consumer standard requires a probability "that a significant portion of the general

5  consuming public or of targeted consumers, acting reasonably under the

6  circumstances, could be misled." *Lavie v. Procter & Gamble Co.*, 105 Cal.App.4th

7  496, 508, 129 Cal.Rptr.2d 486 (2003); see also *Hill v. Roll International Corp.*, 195

8  Cal.App.4th 1295, 1300–01, 128 Cal.Rptr.3d 109 (2011) (holding that the "reasonable

9  consumer" is not the "least sophisticated consumer" or an "unwary consumer," but

10  "[r]ather, California courts consistently have looked to the ordinary consumer within

11  the larger population") (citing *Lavie*, 105 Cal.App.4th at 505–06, 508–10).

12      The question of whether a business practice is deceptive in most cases presents

13  a question of fact not amenable to resolution on a motion to dismiss. *See Williams*,

14  552 F.3d at 938.  However, in certain instances, the Court can properly make this

15  determination and resolve such claims based on its review of the product packaging.

16  *See Brockey v. Moore*, 107 Cal.App.4th 86, 100, 131 Cal.Rptr.2d 746 (2003) ("the

17  primary evidence in a false advertising case is the advertising itself").  Thus, where a

18  Court can conclude as a matter of law that members of the public are not likely to be

19  deceived by the product packaging, dismissal is appropriate.

20      **A.     SHA's Use of "100% All-Natural" is Not Objectively Deceptive**

21      Plaintiff's allegations in the Complaint concerning SHA's purportedly

22  deceptive or false use of the term "100% All-Natural" is completely subjective.  SHA

23  submits that it is manifestly implausible for Plaintiff to allege that a reasonable

24  consumer could interpret "100% All-Natural" as necessarily denoting a food product

25  that is entirely free from any infinitesimal trace of any pesticide or herbicide.  In other

26  words, Plaintiff does not plausibly allege that SHA's labeling was objectively false or

27  deceptive; and Plaintiff's self-serving and idiosyncratic interpretation of SHA's labels

28  is insufficient as a matter of law to plausibly suggest that objectively reasonable

9

1  consumers would share her professed subjective beliefs about the meaning of "100%

2  All-Natural." This is especially true when that product is a single naturally occurring

3  agricultural product like honey. Accordingly, Plaintiff's claims under CLRA, FAL

4  and UCL fail as a matter of law.

5       Indeed, Plaintiff's theory of "100% All Natural" is so expansive that virtually

6  no food could be considered "natural," including apples, bananas, blueberries,

7  broccoli, carrots, cherries, green beans, nectarines, peaches, strawberries, tomatoes,

8  and watermelon – all of which have been found to contain trace amounts of at least

9  one pesticide even after washing. *See* U.S. Dep't of Agric., Pesticide Data Program's

10  (PDP) 24th Annual Summary, Appendix K, at 2 (Jan. 2016) (hereinafter "USDA PDP

11  Summary") (RJN Ex. E). Plaintiff's claim is premised on an interpretation of

12  "natural" as meaning absolute purity that is inconceivable in the world we live in

13  today.

14       Additionally, Plaintiff's proffered definition of the phrase "100% All Natural"

15  consists of mere buzz words. Plaintiff alleges that "consumers reasonably believe that

16  a product labeled '100% all-natural' or '100% pure' does not contain synthetic

17  ingredients . . . does not contain pesticide . . . does not contain anything other than

18  natural honey." (Comp. ¶¶ 34-39.) Of these proposed definitions, only one is relevant

19  to the instant matter, the presence of a pesticide (although technically glyphosate is an

20  herbicide). SHA's honey is pure honey and contains no other ingredients, synthetic or

21  otherwise. Plaintiff points to a 2015 Consumer Reports survey purportedly indicating

22  that a majority of respondents "said that a 'natural' label on packaged and processed

23  foods means that 'no toxic pesticides were used.'" (Comp. ¶¶ 27, 36-37.) First, SHA

24  does not "use" any pesticide in "producing" honey; the honey bees manufacture

25  honey. Second, as discussed above, the EPA has found that consumption of

26  glyphosate at levels vastly above those allegedly detected here is not "toxic" to human

27  health, so this argument completely fails. Moreover, this survey does not address

28  whether reasonable, objective consumers interpret the "100% All-Natural" label used

1    herein, as it applies to honey, to mean that the honey was free of molecular-level
2    traces of safe residues of glyphosate picked up by the bees themselves.  The survey
3    sheds no light on this point.

4         Plaintiff's "100% All-Natural" definition is incompatible with the reality of
5    honey-making.  Reasonable consumers know that honey is naturally produced by
6    honey bees.  They are aware that the bees gather nectar from flowers and bring that
7    nectar back to the colony, in the process performing the valuable service of
8    pollination.  And some consumers are aware that this nectar is then mixed with an
9    enzyme in the bees' mouths and deposited into the honeycomb, where it then turns
10   into the thick sugary syrup known as honey.  While an objectively reasonable
11   consumer may not consider that the bee in collecting the nectar, may have
12   encountered a flower that had been exposed to glyphosate (the most widely used
13   pesticide in the world), this does not negate their understanding of "100% All-
14   Natural," as it relates to honey.  The reasonable consumer would not conclude from
15   reading the label "100% All-Natural," that honey distributers, such as SHA,
16   artificially limit and control which flowers are pollinated by its honey bees.  In fact,
17   such a process would not even be practicable, considering the typical colony of
18   commercial honey bees in the United States contains approximately 40,000 to 60,000
19   worker bees, and these bees forage for several miles from their hive to find nectar.
20   Rather, a reasonable consumer would only plausibly conclude that "100% All-
21   Natural" honey means that it is the natural product of the honey bee, made by its
22   contact with flowers, as they exist in today's world.

23        With respect to single agricultural products, such as honey, the term "100% All-
24   Natural" is a perfectly apt description.  Under Plaintiff's theory, a freshly picked apple
25   would be "unnatural" if it contained trace amounts of herbicides.  If accepted, this
26   theory would eliminate the concept of "natural" foods entirely.  The challenged
27   product here, much like fruits and vegetables, is comprised of just one agricultural
28   product, honey.  With respect to honey as well as other naturally occurring

1  agricultural products, "100% All-Natural" must mean that no artificial or synthetic

2  ingredients have been added to it **after** harvest.

3      This definition is consistent with the FDA's longstanding policy regarding the

4  use of the label "natural."  Since 1993, it has been the FDA's policy "not to restrict the

5  use of the term 'natural' except for added color, synthetic substances, and flavors."

6  *See* 58 Fed. Reg. 2,407 (Jan. 6, 1993).  In 2015, the FDA reiterated this policy,

7  explaining that "We have a longstanding policy for the use of the term 'natural' on the

8  labels of human food" and its policy on the use of "natural" claims "was not intended

9  to address food production methods, such as . . . the use of pesticides." *See* 80 Fed.

10 Reg. 69,905-06 (Nov. 12, 2015).  In other words, the FDA has informed the food

11 industry that it permits "natural" labels on packaged foods, provided that

12 manufacturers do not include added color, synthetic substances, or artificial flavors.

13 In the nearly twenty-five years that this policy has been in place, the FDA has never

14 taken the position that the use of herbicides/pesticides bears on the truthfulness of a

15 "natural" label.

16      In adopting a relatively vague definition of "natural," the FDA and the FTC

17 acknowledged that "natural may be used in numerous contexts and may convey

18 different meanings depending on that context." *See* 75 Fed. Reg at 63,586 (Oct. 15,

19 2010).  As the FTC noted, "a fundamental problem exists by virtue of the fact that the

20 context in which 'natural' is used determines its meaning.  It is unlikely that

21 consumers expect the same thing from a natural apple as they do from natural ice

22 cream." *See* 48 Fed. Reg. 23,270 (May 24, 1983).  Moreover, as the FDA recognized:

23 "[f]rom a food science perspective, it is difficult to define a food product that is

24 'natural' because the food has probably been processed and is no longer the product of

25 the earth." *See* What is the meaning of 'natural' on the label of food?, FDA,

26 http://www.fda.gov/AboutFDA/Transparency/Basics/ucm214868.htm (last updated

27 Mar. 4, 2016); *Astiana v. Kashi Co.*, No. 3:11-CV-01967-H(BGS), 2013 WL

28 3943265, at *13 (S.D. Cal. July 30, 2013) (consumers have no uniform definition of

12

1  'natural').  Consistent with the FDA's reluctance to establish explicit standards for

2  "natural" labeling, courts roundly recognize that "natural" labeling is inherently

3  subjective and has no fixed meaning.  *See Allen v. Hylands Inc.*, 300 F.R.D. 643, 668

4  (C.D. Cal. 2014).  That alone warrants dismissal of Plaintiff's "natural" claims under

5  the reasonable consumer test – if "natural" has no fixed meaning, then it cannot be

6  "material."  *See Leonard v. Abbott Laboratories, Inc.*, No. 10-CV-4676, 2012 WL

7  764199, at *22 (E.D.N.Y. Mar. 5, 2012); *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d

8  973, 979-980 (C.D. Cal. 2013) ("Given the FTC's findings that the term 'natural' can

9  be used in numerous contexts, it is implausible that 'a significant portion of the

10  general consuming public or of targeted consumers would be deceived or misled by

11  the use of the term 'All-Natural' ".)

12         Given the recognition by the FDA and the Courts that "natural" labeling is

13  inherently subjective, a common-sense approach should be viewed by this Court,

14  similar to the court's ruling in *Pelayo*, 989 F. Supp. 2d at 978.  In *Pelayo*, Plaintiff

15  alleged that the "All Natural" labeling on defendants' Buitoni Pastas were false,

16  misleading, and reasonably likely to deceive the public because the Buitoni Pastas

17  contained at least two ingredients that were unnatural, artificial, or synthetic.

18  However, the court held that Plaintiff failed to state a claim under the CLRA or UCL

19  regarding defendants' allegedly false, misleading, and deceptive "All Natural"

20  labeling because she failed to offer an objective or plausible definition of the phrase

21  "All Natural," and the use of the term "All Natural" was not deceptive in context.

22  Specifically, the court noted that the reasonable consumer is aware that Buitoni Pastas

23  are not "springing fully-formed from Ravioli trees and Tortellini bushes."  989

24  F.Supp.2d at 978.

25         Finally, while Plaintiff may want to conflate the FDA's definition of "All

26  Natural" and "Organic," this would be improper, as the FDA has explicitly informed

27  consumers that "natural' and "organic' are different.  An informational document on

28  the FDA's website poses the question "[a]re natural and organic foods the same," and

1    answers that straightforward question clearly and succinctly: "No." *See*
2    http://www.fda.gov/ohrms/dockets/dockets/06p0094/06p-0094-cp00001-05-Tab-04-
3    Food-Marketing-Institute-vol1.pdf (last visited Dec. 20, 2016).
4            In fact, Plaintiff's alleged definition of "100% All Natural" is stricter than
5    "organic." Consumers generally conflate the notions of "natural" and "organic," or
6    hold products labeled "organic" to a higher standard than products labeled "natural,"
7    and, thus, it is implausible that a reasonable consumer would believe ingredients
8    allowed in a product labeled "organic" would not be allowed in a product labeled
9    "100% All Natural." *See Kashi*, 291 F.R.D. at 507–08 (holding that "consumers ...
10   often equate 'natural' with 'organic' or hold 'organic' to a higher standard").
11   "Organic" foods routinely contain trace amounts of pesticides and herbicides. For
12   instance, a study by the United States Department of Agriculture ("USDA") found
13   that approximately 43 percent of fruit and vegetable samples bearing the USDA
14   organic seal had detectable residues of at least one pesticide. *See* USDA, 2010-2011
15   Pilot Study; Pesticide Residue Testing of Organic Produce, at 1. (Nov. 2012) (RJN
16   Ex. F). For this reason, the National Organic Program allows for inevitable trace
17   amounts of pesticides or herbicides in "organic" products. A product is excluded from
18   sale as "organic" only if the synthetic pesticide residue is detected at levels greater
19   than 5% of the EPA's tolerance level for that residue. *See* 7 C.F.R. § 205.671.
20   Plaintiff thus seeks to impose a standard for "100% All-Natural" labels that is far
21   more rigorous than the heavily regulated standard for "organic" products. (Of the 69
22   honey products tested by the scientific research company Abraxis and Boston
23   University in 2015, 41 had glyphosate levels between 17 and 163 ppb, with the mean
24   average being 64 ppb. Moreover, 11 were labeled organic and five of those tested
25   above 15 ppb of glyphosate. Specifically 62 percent of conventional honey and 45
26   percent of organic honey contained glyphosate. *See* Marcus Hondro, 41 Honey
27   Products with High-Level of Roundup Herbicide Glyphosate, DIGITAL JOURNAL
28   (Feb. 19, 2015), http://www.digitaljournal.com/science/honey-found-to-have-high-

14

1    levels-of-roundup-herbicide-glyphosate/article/426458#ixzz4QfRdtdx7).  If
2    objectively reasonable consumers expect that even "organic" products may contain
3    glyphosate residue in the amounts Plaintiff alleges, it is not reasonable as a matter of
4    law to expect that products labeled "100% All-Natural" contain no amount of
5    glyphosate.  Plaintiff's' "100% All-Natural" claims must be dismissed.

6    **B.    SHA's Use of "100% Pure" is Not Objectively Deceptive to
7    Consumers**

8    As a matter of law, Plaintiff cannot show that a reasonable consumer would
9    interpret "100% Pure" as denoting something other than pure honey.  SHA's use of
10   the label "100% Pure" is not misleading for the same reasons that SHA's use of
11   "100% All-Natural" is not misleading.  Additionally, unlike the term "natural," the
12   State of California has defined the term "honey," as:

13   (a)    "Honey" means the natural sweet substance produced by
14          honeybees from the nectar of plants or from secretions of living
              parts of plants or excretions of plant sucking insects on the living
              parts of plants, which the bees collect, transform by combining
15          with specific substances of their own, deposit, dehydrate, store,
              and leave in the honeycomb to ripen and mature.
16

17   California Food & Agriculture Code § 29413. Honey.

18   Remarkably, California's definition of honey aptly describes the pure and
19   natural manner SHA's honey is manufactured by bees without any human
20   involvement.

21   Sue Bee Honey also meets the typical definition of honey found in dictionaries
22   and elsewhere.  Webster's New World Dictionary (3rd Coll. ed. 1998) defines honey
23   as "a thick, sweet, syrupy substance that bees make as food from the nectar of flowers
24   and store in honeycombs."  This definition is consistent with the World Health
25   Organization and Food and Agriculture Organization of the United Nations definition
26   of honey, which is "the natural sweet substance produced by honey bees from the
27   nectar of plants or from secretion of living parts of plants or excretions of plant
28   sucking insects on the living parts of plants, which the bees collect, transform by

1    combining with specific substances of their own, deposit, dehydrate, store and leave in

2    the honey comb to ripen and mature." *See* Codex Alimentarius Standard for Honey,

3    Codex Stan. 12-1981; *Brod, supra*, 895 Supp. 2d 972, 982, Appendix A (state honey

4    definition statutes).

5         This case is also similar to the Central District of California's decision in

6    *Cardona v. Target Corp.*, No. 12–CV–1148, 2013 WL 1181963 (C.D. Cal. Mar. 20,

7    2013). In *Cardona*, the defendants labeled their honey as "pure" when, according to

8    the plaintiff, "pure honey" would not have had pollen removed and defendants

9    removed pollen from their honey. In a stinging rebuke of the plaintiff's argument, the

10   court reasoned that "pure" labeling can be misleading only to the extent it connotes

11   *the addition of other ingredients* to a product. There, since no ingredients were added,

12   only taken away, the court held that defendants' use of the term "pure" did not and

13   could not support a basis for Plaintiff's deceptive marketing claims. *Id.* at *13.

14        Here, Plaintiff does not allege that SHA intentionally added glyphosate to its

15   honey after the harvest, but nevertheless claims that SHA's labeling is misleading

16   because some of the bees may have fed on flowers that had been treated with

17   glyphosate. A similar issue was resolved in *Gallagher v. Chipotle Mexican Grill,*

18   *Inc.*, 15-CV-3952, 2016 WL 454083 at *4 (N.D. Cal. Feb. 5, 2016). In *Gallagher,* the

19   plaintiff alleged that Chipotle's claim that it did not use genetically modified

20   ingredients was misleading because some of the animals whose meat and dairy

21   products Chipotle used may have fed on genetically modified crops. The *Gallagher*

22   court dismissed plaintiff's claim, disagreeing that a reasonable consumer would

23   interpret non-GMO ingredients to mean meat and dairy ingredients produced from

24   animals that never consumed any genetically modified substances. Similarly, the

25   instant Plaintiff's claims are one step removed, and even more implausible, *i.e.*,

26   complaining that the bee itself, by collecting nectar from a treated flower, has made

27   the product impure and unnatural. No reasonable person would reasonably read

28   SHA's labeling in the manner as Plaintiff does. Thus, Plaintiff's allegations are

16

1    unreasonable and are not plausibly material facts to reasonable consumers.

2       Because SHA's use of the label "100% Pure" is not likely to mislead a

3    reasonable consumer acting reasonably under the circumstances, *i.e.*, the Plaintiff's

4    circumstances, Plaintiff's claims under the CLRA, FAL and UCL should be

5    dismissed.

6      **C.**     **Plaintiff's Claims Are Barred By The Safe Harbor Rule**

7       For the same reasons that the claims are preempted, the UCL, FAL and CLRA

8    safe harbors apply. SHA cannot be held under liable under these consumer protection

9    statutes as the USDA Standards and/or 21 U.S.C. § 343(i)(1) require the labeling that

10    SHA used. [1] *See Cel-Tech Commc'ns.Inc. v. Los Angeles Cellular*

11    *TelephoneCompany*, 20 Cal. 4th 163, 182 (1999). SHA is protected from the

12    allegations of the Complaint by the safe harbors because of the "common or usual

13    name" requirements of 21 U.S.C. § 343(i)(1), which require the product to be called

14    "honey" and of Cal. Ag. Code §§ 29413(a), 29416, 29451 and 29677, which provide

15    that "honey" is a product consisting of nectar and bee secretions, and that mislabeling

16    only occurs upon adulteration or an affirmative misrepresentation. Because the safe

17    harbors apply, the UCL, FAL and CLRA claims should be dismissed.

18      The Supreme Court has recognized common law safe harbor doctrine that

19    precludes liability under Section 17200 where the alleged conduct complies with

20    governing state or federal authority. See *Cel-Tech,* 20 Cal. 4th at, 182-83. In other

21    words, where a plaintiff complains of conduct that is otherwise permitted under

22    relevant legislation, she may not "plead around ... barriers to relief by relabeling the

23    nature of the action as one brought under the unfair competition statute." *Rubin v.*

24    *Green*, 4 Cal. 4th 1187, 1201 (1993). Such is the case here. SHA's labeling complies

25

26    [1] *Astiana v. Dreyer's Grand Ice Cream, Inc.,* 2012 WL 2990766, * 8,
FN6,(N.D.Cal.) (California Health & Safety Code § 110100(a) expressly adopts

27    the standards articulated in the FDCA ("[a]ll food labeling regulations and any
amendments to those regulations adopted pursuant to the federal act [i.e., FDCA],

28    in effect on January 1, 1993, or adopted on or after that date shall be the food
labeling regulations of this state."))

1    with the controlling federal regulations and Plaintiff has not properly alleged

2    otherwise.  Plaintiff has not alleged any facts to suggest that SHA has engaged in any

3    independently unlawful, unfair, or fraudulent conduct that is actionable under Section

4    17200.  See *Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, 290 F.3d 1055,

5    1058 (9th Cir. 2002); *Oxina v. Land's End, Inc.*, 2015 WL 4272058, *8-10 (S.D. Cal.

6    Jun. 19, 2015).

7            Similarly, the courts have now recognized the safe harbor applies to CLRA and

8    FAL claims.  *See Alvarez v. Chevron Corp.,* 656 F.3d 925, 933–34 (9th Cir.2011);

9    *Pom Wonderful LLC v. Coca Cola Co.*, No. CV 08–06237 SJO(FMOx), 2013 WL

10   543361, at *5 (C.D.Cal. Apr. 16, 2013); *Barber v. Nestle USA, Inc.,* 154 F.Supp.3d

11   954, 959-962 (2015); *Ebner v. Fresh Inc.,* No. SACV 13–00477 JVS(RNBx), 2013

12   WL 9760035, at *1, *5 (C.D.Cal. Sep. 11, 2013); *Alvarez v. Chevron Corp.*, 656 F.3d

13   925, 928 (9th Cir. 2011); *Lopez v. Nissan N. Am., Inc.,* 201 Cal.App.4th 572, 591–92,

14   135 Cal.Rptr.3d 116; *Loeffler v. Target Corp.,* 58 Cal.4th 1081, 1126, (2014)

15   (dismissing UCL claims when plaintiffs claimed a "consumer action should lie

16   whether or not" a retailer complied with the provision under which the defendant

17   sought a safe harbor).  Thus, Plaintiff's claims are also barred by the applicable safe

18   harbor.

19   **V.    THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS BECAUSE**
20   **       PLAINTIFF LACKS STANDING**

21           Plaintiff lacks standing to assert her California consumer claims because she

22   cannot allege that she has "suffered 'an invasion of a legally protected interest' that

23   is 'concrete and particularized' and 'actual or imminent, not conjectural or

24   hypothetical.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  The UCL

25   requires a specific form of "injury in fact," namely, a loss of money or property,

26   *Hall v. Time Inc.*, 158 Cal.App.4th 847, 852-854 (2008), and Plaintiff must show

27   either prior possession of or an ownership interest in the money or property

28   allegedly lost.  *Madrid v. Perot Systems Corp.*, 130 Cal.App.4th 440, 455 (2005);

1  *Buckland v. Threshold Enterprises, Ltd.*, 155 Cal.App.4th 798, 817 (2007).  The

2  Complaint falls well short of satisfying these pleading requirements.

3      **A.      The Court Should Dismiss Plaintiff's Purported "Failure to Warn"**

4              **Claim for Lack of Standing**

5          Plaintiff does not allege that she has suffered any adverse health effects as a

6  result of eating Sue Bee Honey, only baseless fears of such.  (Comp. ¶¶5, 48, 84(g).)

7  Her subjective belief that alleged microscopic traces of glyphosate in SHA's honey is

8  dangerous – despite express scientific findings to the contrary – is insufficient to plead

9  "concrete" injury-in-fact.  *See Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257,

10  259 (3d Cir. 2010) (dismissing claim regarding trace amounts of lead that the FDA

11  determined to be non-dangerous for lack of standing because the asserted injury-in-

12  fact was based only on the "subjective allegation that the trace amounts of lead . . . are

13  unacceptable" to the plaintiff); *Boysen v. Walgreen Co.*, No. C 11-06262, 2012 WL

14  2953069, at *6-7 (N.D. Cal. July 19, 2012) (dismissing for lack of standing omission

15  claims regarding the presence of trace amounts of arsenic and lead where the FDA had

16  determined that the levels alleged were safe).

17          Simply pointing out alleged problems, and waxing rhetorical, is not enough to

18  establish an injury in fact.  "Threatened injury must be certainly impending to

19  constitute injury in fact," and Plaintiff's fear that miniscule trace amounts of

20  glyphosate might cause some adverse health effects in the future falls far short of

21  crossing this threshold.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147-48

22  (2013) (internal quotation marks omitted).  As a number of courts have recognized,

23  "[f]ear and apprehension about a possible future physical or medical consequence of

24  exposure" to a substance "is not enough to establish an injury in fact." *In re Whole*

25  *Foods Mkt. Grp., Inc. Overcharging Litig.*, 15 Civ. 5838 (PAE), 2016 WL 852796, at

26  *9 (S.D.N.Y. Mar. 1, 2016) ("a claim based only on probabilistic evidence of injury,

27  devoid of any factual allegations particular to the plaintiff and without a basis to

28  plausibly infer that all covered products were implicated, does not adequately plead

1 injury-in-fact").

2      Plaintiff cannot justify her fear by pointing to a report from the IARC to support

3 her assertion that glyphosate is a "probable" human carcinogen.  (Comp. ¶ 48.)

4 "IARC . . . does not estimate the level of 'risk' to the population associated with

5 exposure to [a perceived] hazard," (*see* WHO, Food Safety, Frequently Asked

6 Questions, (May 27, 2016), http://www.who.int/foodsafety/faq/en/) and thus has

7 identified everything from working as a hairdresser, to drinking hot beverages, to

8 working the nightshift, as "probable" human carcinogens.  *See also* IARC, List of

9 Classifications, Vols. 1-116,

10 http://monographs.iarc.fr/ENG/Classification/latest_classif.php.  Plaintiff cannot

11 bridge the gap from speculative fear to imminent risk of concrete injury "simply" by

12 "cit[ing] to a study which purports to show that a certain chemical causes harm

13 without evaluating the extent of the exposure."  *C.W. v. Textron*, No. 3:10 CV-87 PPS,

14 2014 WL 1047940, *7 (N.D. Ind. March 17, 2014).  This is especially true here,

15 where Plaintiff alleges the existence of infinitesimal trace amounts of a substance far

16 below acceptable federal standards.

17      **B.      The Court Should Dismiss Plaintiff's Claims as She Has No Injury**

18      With respect to allegations of actual injury suffered, Plaintiff articulates two

19 theories:  first, that Plaintiff would not have purchased the products had they been

20 truthfully advertised and labeled (Comp. ¶¶13, 86, 95), and second, that Plaintiff paid

21 a "premium" price for the honey.  (Comp. ¶¶ 15, 71, 84(a), 87, 96.)

22      Although Plaintiff alleges that she would not have purchased the honey had she

23 known that it potentially contained trace amounts of glyphosate, "[m]erely asking for

24 money [back] does not establish an injury in fact."  *Rivera v. Wyeth-Ayerst Labs*, 283

25 F.3d 315, 319, 320-21 (5th Cir. 2002); *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d at

26 56 (plaintiffs who alleged that they would not have purchased cigarettes if they had

27 known that nicotine was addictive had not suffered a legally cognizable injury, and

28 thus could not recover reimbursement for the cost of the cigarettes).  In short, because

1  Plaintiff failed to allege actual harm or that she sustained a concrete pecuniary injury,

2  this Court should determine that Plaintiff failed to state an injury in fact as required by

3  the CLRA, UCL and FAL. *Baron v. Pfizer, Inc.*, 42 A.D.3d 627, 840 N.Y.S.2d 445

4  (3d Dep't 2007) (dismissing plaintiff's claim because her request for a refund of the

5  purchase price of Neurontin on the ground that she would not have purchased the drug

6  absent defendant's deceptive practices was not an injury in fact).  Demanding return

7  of the purchase price of the honey because of the alleged presence of legally

8  permissible microscopic particles of a herbicide does not establish injury in fact.

9        Plaintiff's second theory – that she paid a premium for the product – should

10  also fail. Plaintiff has failed to provide any information about the price she paid for

11  SHA's products, let alone to show how the product sold at a "premium" because of

12  SHA's representations.  Plaintiff wholly fails to allege facts to support a "difference in

13  value" that allegedly resulted from the specific conduct she challenges, *i.e.,* the

14  discovery of trace amounts of glyphosate. *Izequierdo v. Mondelez International, Inc.*,

15  16-CV-4697, 2016 WL 6459832 at *7 (S.D.N.Y. Oct. 26, 2016) (In denying

16  plaintiff's claim the Court held: "Simply because Plaintiffs here recite the word

17  'premium' multiple times in their Complaint does not make Plaintiffs' injury any

18  more cognizable.  Plaintiffs have not alleged that they paid a *higher* price for the

19  Candy than they otherwise would have, absent deceptive acts. And Plaintiffs' pointing

20  out that the Candy is more expensive per ounce than other sweets on the market brings

21  them no closer to stating a claim for injury.") (emphasis in original).  Moreover,

22  Plaintiff fails to specifically allege which Sue Bee Honey products she purchased

23  (Comp. ¶21.), or that she could have purchased "comparable" honey without trace

24  amounts of glyphosate, or the "comparable" honey that she contends properly

25  discloses glyphosate in accordance with her novel interpretation of FDA regulations.

26  *Lieberson v. Johnson & Johnson Consumer Co.*, 865 F. Supp. 2d 529, 541-42 (D. N.J.

27  2011) (dismissing claim due to failure to allege price paid for products, price of the

28  products generally, or identity or cost of any specific comparable product); *Weiner v.*

21

1    *Snapple Beverage Corp.*, No. 07 Civ. 8742(DLC), 2011 WL 196930, at *3 (S.D.N.Y.

2    Jan. 21, 2011) (failure to offer the "prices of competing or comparable beverages that

3    did not contain the alleged mislabeling" renders the allegation of injury based on

4    alleged price premium insufficient). Accordingly, Plaintiff's claims must therefore be

5    dismissed because Plaintiff failed to allege sufficient injury-in-fact to support Article

6    III standing.

7    **VI.   THE COURT SHOULD DISMISS THE COMPLAINT IN ITS**

8    **ENTIRETY, OR AT THE LEAST STAY THIS ACTION, UNDER THE DOCTRINE OF PRIMARY JURISDICTION BECAUSE THE FDA IS IN THE PROCESS OF PROMULGATING A DEFINITION OF**

9    **"NATURAL"**

10    The Court should dismiss the Complaint, or at the least stay this action, under

11    the doctrine of primary jurisdiction because, in order to attain nationwide uniformity

12    of labeling requirements, Congress has committed the matter of labeling foods as

13    "natural" or not, to the expertise of the FDA, which is now in the midst of preparing

14    federal guidelines concerning such labeling. In that way, the FDA will be allowed to

15    fulfill its mandate to resolve the issue in the first instance, "maintaining uniformity in

16    the regulation of an area entrusted to a federal agency[.]" *Ellis v. Tribune Television*

17    *Co.*, 443 F.3d 71, 82 (2d Cir. 2006); *see also* 21 C.F.R. § 10.25(b) ("FDA has primary

18    jurisdiction to make the initial determination on issues within its statutory mandate").

19    The FDA is the federal agency that has been tasked by Congress with the

20    responsibility for establishing uniform labeling regulations for food such as Sue Bee

21    Honey, and it is the entity that is equipped to establish a national, coherent, and

22    uniform standard for "natural." *Coyle v. Hornell Brewing Co.*, Civil No. 08-02797

23    (JBS), 2010 WL 2539386, at *4 (D.N.J. June 15, 2010) ("The use of the term 'natural'

24    as it pertains to food and beverage labeling falls within the FDA's discretion.").

25    In November 2015, the FDA published a request for comments concerning the

26    "Use of the Term 'Natural' in the Labeling of Human Food Products," 80 Fed. Reg.

27    69,905 (Nov. 12, 2015), and the questions the Agency posed involve the very issues

28    raised in the Complaint, including whether "certain production practices used in

22

agriculture, for example . . . the use of pesticides . . . [should] be a factor in defining 'natural.'"  *Id.* at 69,908.  When the notice and comment period closed on May 10, 2016, the Agency had received nearly 7,700 comments.  Upon the completion of its review of those documents, the FDA will decide whether to revise its policy vis-à-vis the term "natural" and/or adopt a regulatory definition of that term.

Allowing individual courts to make judicial determinations as to the appropriate definition for "natural" on food labels would result in a patch-work of decisions and differing requirements – on a case-by-case and product-by-product basis, no less – that would make uniform food labels impossible. Permitting the FDA to resolve "natural" labeling issues in the first instance "will ensure national uniformity in labeling" which is "particularly significant" where, as here, "several recently-filed . . . lawsuits throughout the country involve the same or similar issues as found in the instant suit [and] [t]he increasing volume of this litigation creates the potential for inconsistent judicial rulings." *Taradejna v. Gen. Mills, Inc.*, 909 F. Supp. 2d 1128, 1135 (D. Minn. 2012).

In *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760-62 (9th Cir. 2015), the Ninth Circuit observed that "[p]rimary jurisdiction is a prudential doctrine that permits courts to determine 'that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch.'" 783 F.3d at 760 (citing *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008).)  In the Ninth Circuit, primary jurisdiction is evaluated on the following factors, "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002).  The doctrine is reserved for a "limited set of circumstances" that "requires resolution of an issue of first

1    impression, or of a particularly complicated issue that Congress has committed to a

2    regulatory agency." *Clark*, 523 F.3d at 1114 (quoting *Brown v. MCI WorldCom*

3    *Network Servs.*, 277 F.3d 1166, 1172 (9th Cir. 2002)) (internal quotation marks

4    omitted).  In *Astiana* the Ninth Circuit held that "[d]etermining what chemical

5    compounds may be advertised as natural on cosmetic product labels is 'a particularly

6    complicated issue that Congress has committed to' the FDA," and thus "[o]btaining

7    expert advice from that agency would help ensure uniformity in administration of the

8    comprehensive regulatory regime established by the FDCA." 783 F.3d at 761. Now

9    that FDA has actually opened a formal public comment docket on "natural" labeling

10   standards through its Request, the teachings of *Astiana* are all the more persuasive and

11   applicable.  In fact, the FDA's action is a direct response, in part, to requests made by

12   "[f]ederal district courts" addressing private "natural" false advertising lawsuits.

13         There is an avalanche of precedent applying the primary jurisdiction doctrine to

14   food labeling issues that the FDA is in the process of considering and it points

15   uniformly to deferring to the FDA on the "natural" issues raised by Plaintiff so that

16   the FDA can complete its work.  *See, e.g., Walker v. B&B Foods, Inc.*, No. 15-cv-

17   03772, 2016 WL 463253 (N.D. Cal. Feb. 8, 2016); *Red v. Gen. Mills, Inc.*, No. 2:15-

18   cv-02232, 2015 WL 9484398 (C.D. Cal. Dec. 29, 2015); *Kane v. Chobani,* 645 Fed.

19   Appx., 593, 594-95 (9th Cir. 2016); *Viggiano v. Johnson & Johnson,* No. 2:14-cv-

20   7250, ECF No. 55 (C.D. June 21, 2016); *Anderson v. Hain Celestial Group, Inc.*  No.

21   5:14-cv-3895, ECF No. 62 (N. D. Ca. Apr 8, 2016; *Backus v. Gen. Mills, Inc.*, No. 15-

22   cv-01964-TEH, 2015 WL 4932687 (N.D. Cal. Aug. 19, 2015) *see also Saubers v.*

23   *Kashi Co.*, 39 F. Supp. 3d 1108, 1112-13 (S.D. Cal. 2014); *Swearingen v. Healthy*

24   *Beverage LLC*, No. C-13-4835 EMC, 2014 WL 2696719 (N.D. Cal. June 11, 2014);

25   *Gitson v. Clover-Stornetta Farms, Inc.*, No. C-13-01517(EDL), 2014 WL 2638203

26   (N.D. Cal. June 9, 2014); *Smedt v. The Hain Celestial Group, Inc.*, No. 5:12-CV-

27   03029-EJD, 2014 WL 2466881 (N.D. Cal. May 30, 2014).

28         In fact, the case for applying primary jurisdiction is stronger here given that

24

1  (1) the FDA has expressly taken up "natural" labeling in direct response to the recent

2  swarm of "natural" lawsuits; and (2) a plaintiff named Jason Scholder has filed at least

3  three other hive-minded lawsuits in the Eastern District of New York, involving the

4  alleged presence of glyphosate residue in products marketed as natural.  See *Jason*

5  *Scholder v. Sioux Honey Association,* Cooperative, Case No. 16-cv-05369

6  (ADS)(GRB); *Scholder v. Topco Holdings, Inc.,* No. 2:16-cv-06028-LDW-GRB

7  (E.D.N.Y.) (Dkt. 1) (Oct. 31, 2016), (alleging that "all natural" granola products

8  contain traces of glyphosate from the growing process); *Scholder v. Erbo North*

9  *America, and New World Pasta Co.,* No. 16-cv-06002-ADS-AKT (E.D.N.Y.) (Dkt. 1)

10  (Oct. 28, 2016) (alleging that "all natural" pasta products contain traces of glyphosate

11  from the growing process).  Plaintiff should not be able to upset the FDA's regulatory

12  process midstream by joining in the filing these drone-like claims.

13        Here, as the FDA has now expressly taken up the question of the use of the term

14  "natural" in labels on food stuff the doctrine of primary jurisdiction compels the

15  conclusion that Plaintiff's complaint be dismissed.  An FDA determination that trace

16  elements of herbicides/pesticides are permitted in foods labeled "all natural" will

17  provide additional express preemption of Plaintiff's claims.

18  **VII.   CONCLUSION**

19        For the foregoing reasons, SHA respectfully requests that this Court dismiss all

20  of Plaintiff's claims or, in the alternative, stay proceedings under the primary

21  jurisdiction doctrine pending the FDA's review of "natural" and the EPA's

22  registration review of glyphosate.

23  DATED:  March 16, 2017                          HINSHAW & CULBERTSON LLP

24

25                                                  By: */s/ David I. Dalby*
                                                    David I. Dalby
26                                                  *Attorneys for Defendant*
                                                    SIOUX HONEY ASSOCIATION,
27                                                  COOPERATIVE

28  3556640v1  0992100