JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Susan Tran, | CASE NO. 8:17-cv-00110-JLS-SS |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 145)** |
| Sioux Honey Association, Cooperative, | |
| Defendants. | |

1

1        Before the Court is a Motion for Summary Judgment filed by Defendant Sioux
2 Honey Association, Cooperative.  (Mot., Doc. 145-12.)  Plaintiff Susan Tran opposed.
3 (Opp., Doc. 152.)  Sioux Honey replied.  (Reply, Doc. 163.)  Having held a hearing and
4 taken the matter under submission, for the following reasons, the Court GRANTS the
5 Motion.

6 **I.**   **BACKGROUND**

7        This is consumer protection class action brought by Plaintiff and Class
8 Representative Susan Tran concerning Sioux Honey's asserted misrepresentations and
9 omissions regarding its honey products.

10     **A.**   **Factual Background**

11        Sioux Honey makes, markets, sells, and distributes honey under various trademarks,
12 including Sue Bee and Aunt Sue's.  (First Amended Complaint ("FAC") ¶ 20, Doc. 34.)[1]
13 Sioux Honey is a "honey cooperative . . . comprised of more than 275 individual
14 beekeepers."  (Mot. at 1.)  This lawsuit concerns Sioux Honey products labeled as "Pure"
15 and "100% Pure."[2]  The products at issue are Sue Bee Clover Honey, Sue Bee Orange
16 Honey, Sue Bee Sage Honey, Sue Bee LT. Amber Honey, Sue Bee Bulk Honey, Sue Bee
17 Spun Clover Honey, Aunt Sue's Raw unfiltered Clover Honey, Aunt Sue's Raw unfiltered
18 Wildflower Honey, Aunt Sue's Organic Honey, Blossomology Organic Honey, North
19 American Honey, and Bradshaw Honey ("the Products").  (Lenci Decl. ¶ 2, Doc. 145-1.)
20 Tran's theory of this case is that the Products are misleadingly labeled under California

[1] Central District of California Local Rule 56 required the parties to submit concise statements of facts incorporating "all material facts."  While Sioux Honey and Tran each submitted a statement of facts, (Sioux Statement of Facts, Doc. 145-13; Tran Statement of Facts ("Tran SOF"); Doc. 152-23), neither addresses the fundamental background facts of this litigation.  Accordingly, the Court refers to uncontested allegations of Tran's FAC and background facts offered by the parties in their briefs.  The Court is not deeming these facts true or relying on them for the purposes of resolving Sioux Honey's Motion for Summary Judgment.

[2] The "100% Pure" label appeared for a short time on only Sioux Honey's "Aunt Sue" and "North America" Products.  (Tran SOF at 7.)  Sioux Honey made wider use of the "Pure" label. (*Id.*)

consumer protection statutes because they contain glyphosate, a synthetic chemical and herbicide. (FAC ¶¶ 4, 37, 40.)

Tran relies in part on testing carried out by the FDA in 2016 on a Sioux Honey sample which identified the presence of Glyphosate in a concentration of 41 parts per billion. (Tran Request for Judicial Notice ("RJN") Ex. 3, Doc. 150-3.)[3] A subsequent 2018 analysis commissioned by Tran's counsel, the Richman Law Group, on three unidentified samples of Sue Bee Clover Spun Honey returned varied results — there was no detectable level of glyphosate in one sample; 30 parts per billion in a second sample, and 40 parts per billion in a third sample. (Tran Statement of Facts ("Tran SOF") at 3, Doc. 152-23; Tran Commissioned Study, Richman Decl. Ex. 4, Doc. 152-2.) The parties concur that any glyphosate which may be found in the Products is not an additive incorporated during the manufacturing process, but rather is a byproduct of the honey's natural production, unintentionally mixed into the product by the honey-producing bees, which encounter the glyphosate herbicide in nature. (Tran SOF at 3.)

Tran states that she began purchasing Sioux Honey Products while residing in Washington State. (Tran Decl. ¶ 3, Doc. 129.) She continued to purchase the Products following her June 2013 relocation to California, buying them from a Vons Supermarket in Grover Beach, California. (*Id.*) Tran attests that she purchased the Products in reliance on Sioux Honey's representations that they were "Pure" and "100% Pure," believing that those labels indicated that "the products only contained honey, and nothing else, such as chemicals or impurities." (*Id.* ¶ 4.) Former Sioux Honey Vice President of Research and Development William Huser has testified that Sioux Honey uses those labels to

---

[3] Tran requests that the Court take judicial notice of three documents produced by the Food and Drug Administration in response to a January 23, 2020 Freedom of Information Act request submitted by her counsel, Levi & Korsinsky, LLP. (Request for Judicial Notice ("RJN"), Doc. 150.) Sioux Honey opposed the RJN. (RJN Opp., Doc. 161.) Under Federal Rule of Evidence 201, a court "may take judicial notice of undisputed matters of public record," such as government documents from reliable sources. *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012); *Juliana v. United States*, No. 6:15-CV-01517-AA, 2018 WL 9802138, at *1 (D. Or. Oct. 15, 2018). Accordingly, Tran's RJN is GRANTED.

1  communicate to consumers that the Products contain "one ingredient, no other ingredients,

2  no additives," nothing but honey produced by honeybees.  (Tran SOF at 6, Huser Depo. at

3  34:5-20, Lenci Decl. Ex. 7, Doc. 145-8.)

4      **B.   Procedural History**

5      Tran filed this class action on January 23, 2017, alleging Sioux Honey's

6  misrepresentations and omissions. (Compl., Doc. 1.) Tran then filed her First Amended

7  Complaint on April 6, 2017.  (FAC.)  In her FAC, Tran asserts the following claims

8  against Sioux Honey: (1) violation of California's Consumers Legal Remedies Act

9  ("CLRA"); (2) violation of California's False Advertising Law ("FAL"); and (3) violation

10  of California's Unfair Competition Law ("UCL"). (*Id.* ¶¶ 108–47.)

11      Thereafter, the Court denied Sioux Honey's Motion to Dismiss, holding that at the

12  pleading stage, it could not "determine as a matter of law that Sioux Honey's use of the

13  words 'Pure' or '100% Pure' would not deceive the reasonable consumer."  (MTD Order,

14  Doc. 62.)  Subsequently, the Court granted in part Tran's Motion for Class Certification,

15  certifying the following Rule 23(b)(2) injunctive and declaratory relief Class:

16

17      All persons residing in California, who, from January 2014 to the Present,

18      purchased, for personal use and not resale, Sue Bee Products.

19

20  (Class Certification Order, Doc. 182.)

21      Sioux Honey now seeks summary judgment on each of Tran's claims.

22  **II.   <u>LEGAL STANDARD</u>**

23      In deciding a motion for summary judgment, the Court must view the evidence in

24  the light most favorable to the non-moving party and draw all justifiable inferences in that

25  party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary

26  judgment is proper "if the [moving party] shows that there is no genuine dispute as to any

27  material fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R.

28  Civ. P. 56.  A factual dispute is "genuine" when there is sufficient evidence such that a

1  reasonable trier of fact could resolve the issue in the non-movant's favor, and a fact is

2  "material" when it might affect the outcome of the suit under the governing law. Anderson,

3  477 U.S. at 248.  But "credibility determinations, the weighing of evidence, and the

4  drawing of legitimate inferences from the facts are jury functions, not those of a judge."

5  *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v.*

6  *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

7        The role of the Court is not to resolve disputes of fact but to assess whether there

8  are any factual disputes to be tried.  The moving party bears the initial burden of

9  demonstrating the absence of a genuine dispute of fact.  *Celotex Corp. v. Catrett*, 477 U.S.

10  317, 323 (1986).  When the moving party will not bear the burden of proof at trial, it may

11  satisfy its initial burden at the summary judgment stage by "produc[ing] evidence negating

12  an essential element of the nonmoving party's claim or defense or show[ing] that the

13  nonmoving party does not have enough evidence of an essential element to carry its

14  ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies,*

15  *Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "Once the moving party carries its initial

16  burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse

17  party's pleading,' but must provide affidavits or other sources of evidence that 'set forth

18  specific facts showing that there is a genuine issue for trial.'"  *Devereaux v. Abbey*, 263

19  F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

20  **III.   DISCUSSION**

21        Sioux Honey sets forth three arguments in its Motion for Summary Judgment: (1)

22  each asserted claim fails because Tran has not produced evidence in support of essential

23  elements of those claims (Mot. at 5-12); (2) Tran lacks standing to assert claims in

24  connection with Products labeled "100% Pure" because she did not purchase a Product

25  bearing that label (*id*. at 13); and, (3) because Tran "has an adequate remedy at law under

26  the CLRA for 'actual damages,' her claims for equitable relief under CLRA, FAL, and

27  UCL must be dismissed" (*id*. at 14-16).  The Court addresses Sioux Honey's standing

28  argument first, before turning to its evidentiary argument.  Finding Tran's lack of evidence

1    on a key element requires summary judgment in Sioux Honey's favor, the Court does not

2    reach Sioux Honey's third argument.

3        **A.  Standing**

4        Sioux Honey contends that Tran lacks standing to bring claims in connection with

5    labels claiming that any Product was "100% Pure" because she never purchased any Sioux

6    Honey product adorned with that label, and so cannot assert that it caused her to suffer

7    economic harm.  (*Id*. at 13 (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 330,

8    246 P.3d 877, 890 (2011); *see also* Reply at 11-14.)  The Court has already addressed, and

9    rejected, similar arguments submitted by Sioux Honey in opposition to Tran's Motion for

10   Class Certification.  (*See* Class Certification Order at 9-10, 9 n.5.)  There, the Court

11   explained that "plaintiffs bringing UCL, FAL, or CLRA claims meet the economic injury

12   requirement if they show that, by relying on a misrepresentation on a product label, they

13   paid more for a product than they otherwise would have paid, or bought it when they

14   otherwise would not have done so."  (*Id*. at 9 (citing Order Denying Sioux Honey's Motion

15   to Dismiss at 3, Doc. 62) (internal quotations omitted); *see Reid v. Johnson & Johnson*,

16   780 F.3d 952, 958 (9th Cir. 2015).)  Even based upon the evidence submitted in

17   connection with her Motion for Class Certification, the Court held that Tran readily

18   satisfied the economic injury requirement with respect to her purchase of Products labeled

19   as "Pure."  (Class Certification Order at 9-10.)  The Court further held that Tran may

20   represent Class Members with claims arising from the purchase of Products labeled "100%

21   Pure" as those claims are "reasonably co-extensive with those arising" from the purchase

22   of products labeled "Pure," even if not identical.  (*Id*. at 9 n.5 (discussing the standard set

23   forth in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).)

24       Sioux Honey's argument was properly addressed at the class certification stage and

25   is presently inapposite.  That is because Rule 23, rather than standing, provides the proper

26   framework for the question raised.  *See Clancy v. The Bromley Tea Co.*, 308 F.R.D. 564,

27   569-71 (N.D. Cal. 2013) (synthesizing broad body of caselaw with three different

28   approaches to addressing differences between the claims of class representative and absent

6

class members) (concluding that "analyzing the 'sufficient similarity' of [related but distinct] products" purchased by class representatives and members is a Rule 23 inquiry rather than one of standing); *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 539 (N.D. Cal. 2012) (addressing argument, similar to Sioux Honey's, at class certification stage and finding claims involving similar products to be "reasonably coextensive"); *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 890 (N.D. Cal. 2012) (similarly noting this is a question for the class certification stage but also stating that "[t]he majority of the courts that have carefully analyzed the question hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar"). "'Representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.'" *Greenwood v. Compucredit Corp.*, No. CIV. 08-04878 CW, 2010 WL 4807095, at *3 (N.D. Cal. Nov. 19, 2010) (quoting AA Wright et al., Federal Practice and Procedure (3d.2005) § 1758.1 pp. 388–89). This Court has already determined that Tran meets Rule 23's requirements, including those of typicality and adequacy.

Accordingly, Sioux Honey's standing argument does not undercut Tran's assertion of claims, on behalf of the Class, pertaining to the purchase of Products labeled "100% Pure."

**B.    Tran Fails to Offer Evidence That Would Allow a Reasonable Factfinder to Conclude that the Labels Were Deceptive to the Reasonable Consumer.**

Claims made under the CLRA, FAL, and UCL are governed by the "reasonable consumer" test. *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citations omitted). Under that test, to prevail at trial, Tran must show that "members of the public are likely to be deceived." *Id.* (citation omitted). "'Likely to deceive' implies more than a mere possibility that the advertisement might conceivably be misunderstood

1  by some few consumers viewing it in an unreasonable manner." *Lavie v. Proctor &*

2  *Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).  Rather, it must be "probable that a

3  significant portion of the general consuming public or of targeted consumers, acting

4  reasonably in the circumstances, could be misled."  *Id.*  The relevant consumer is "the

5  ordinary consumer within the larger population," not the "least sophisticated consumer"

6  nor one that is "exceptionally acute and sophisticated."  *Hill v. Roll Int'l Corp.*, 195 Cal.

7  App. 4th 1295, 1304 (2011) (citation omitted).

8       When it comes to the deceptiveness of the "Pure" labels, the issue has been clear

9  from the outset of this case:  would a reasonable consumer who was presented with the fact

10  that the Products might contain up to 41 parts per billion of glyphosate be misled by a label

11  that says the honey is "Pure" or "100% Pure?"  (*See* October 11, 2017 Referral Order at 2-

12  5 (noting that the FDA's input would help clarify the "reasonable consumer's

13  understanding of the terms 'Pure' or '100% Pure' with respect to trace amounts of

14  glyphosate in honey").)  As Sioux Honey points out, some courts have concluded that a

15  claim such as Tran's cannot survive even a motion to dismiss.  *See e.g., In re Gen. Mills*

16  *Glyphosate Litig.*, No. CV 16-2869 (MJD/BRT), 2017 WL 2983877, at *5 (D. Minn. July

17  12, 2017) (finding it "implausible that a reasonable consumer would believe that a product

18  labelled as having one ingredient—oats—that is '100% Natural' could not contain a trace

19  amount of glyphosate that is far below the amount permitted for organic products.")

20  (granting a motion to dismiss); *Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d

21  241, 247 (S.D.N.Y. 2019) ("a reasonable consumer would not be so absolutist as to require

22  that 'natural' means there is no glyphosate, even an accidental and innocuous amount, in

23  the Products") (granting a motion to dismiss); *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d

24  170, 183 (E.D.N.Y. 2018), *aff'd sub nom. Axon v. Florida's Nat. Growers, Inc.*, No. 19-

25  203-CV, 2020 WL 2787627 (2d Cir. May 29, 2020) ("Given the widespread use of

26  herbicides, the court finds it 'implausible that a reasonable consumer would believe that a

27  product labeled ['Florida's Natural'] could not contain a trace amount of glyphosate that is

28

1    far below the amount deemed tolerable by the FDA.") (alteration in original) (affirming
2    district court's grant of a motion to dismiss).

3           This Court, however, was unwilling to answer that question as a matter of law at the
4    pleading stage.  (*See* MTD Order at 7-11.)  Specifically, in resolving Sioux Honey's
5    Motion to Dismiss, the Court explained that "[r]easonable consumers may understand that
6    trace amounts of pesticide could end up in their honey from the bees' interaction with the
7    modern world, or they may interpret the word 'Pure' (and particularly, '100% Pure') to
8    mean that the final product does not contain any substance (even in trace amounts) that is
9    not essential to the honey, particularly synthetic substances such as glyphosate."  (MTD
10   Order at 9.)  Now though, upon Sioux Honey's Motion for Summary Judgment, it is
11   incumbent upon Tran to introduce evidence that could support a finding that reasonable
12   consumers believe the word "Pure" on the label means that there will be no *trace amounts*
13   of pesticide in their honey, even if from the natural process of foraging bees.  She has
14   failed to do so.

15          In arguing that there is an issue of fact which must be submitted to a factfinder,
16   Tran relies exclusively on a Survey and accompanying Expert Report of Dr. Thomas J.
17   Maronick (Maronick Report, Richman Decl. Ex. 20, Doc. 152-21).  (*See* Opp. at 10-14.)
18   Dr. Maronick states he was "retained to design an online consumer survey to test the
19   materiality of the term 'Pure' and to determine consumer understanding of the term 'Pure'
20   when associated with Sue Bee Honey."  (Maronick Report at 3.)

21          Maronick conducted his Survey using the Qualtrics.com internet survey platform,
22   utilizing a sample population of 251 individuals over 18 who (1) lived in California, (2)
23   were their household's primary food shopper or shared responsibilities for food shopping,
24   and (3) purchased or considered purchasing processed honey in the two months preceding
25   the Survey.  (Maronick Report at 4, 8.)  Survey participants were shown the following
26   image of a Sue Bee Clover Honey Product in a 12-ounce bear-shaped bottle:

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18  (*Id*. at 9-10.)  After viewing the photograph, participants were asked a number of

19  questions.[4]  The 159 participants who responded that they saw the phrase "Pure Premium

20  Honey" on the label were asked two follow-up questions about the meaning of that term.

21  First, they were asked the open-ended question, "[w]hat does the word 'Pure' mean to you

22  when you see it on a label for honey?"  Second, they were asked "[b]ased on what you saw

23  on the label, which of the following, if any, reflect your understanding of what 'Pure'

24  means when you see it on a label for honey?"  Participants were given the following

25  response options:

26      □  No additives

27  _____

28      [4] The full Survey can be found in the Appendix to this Order.

1        □ Nothing artificial

2        □ Made from pure bees

3        □ Made with no chemicals

4        □ Nothing but honey

5        □ No chemical residues

6        □ Other (specify)

7        □ Don't know/not sure

8 (Maronick Report at 11-15; Survey Screenshot, Maronick Report Ex. D, Doc. 152-21 at

9 31-37.)

10        In responding to the open-ended question about the meaning of the word "pure,"

11 five participants stated something to the effect that the term indicated the product

12 contained no chemicals, 19 stated that it meant the product contained nothing artificial, 52

13 stated that it meant that the product was "natural" or "just honey," and 54 stated that it

14 meant that the honey contained no additives or substances added to it.  (*See* Maronick

15 Report at 13; Qualtrics Survey Data Report at 41-43.)

16        In response to the "closed-end" question as to what "pure" meant, 115 selected "no

17 additives," 123 selected "nothing artificial," 108 selected "no chemicals," 114 selected

18 "nothing but honey," 100 selected "no chemical residues," and 77 selected "made from

19 pure bees."[5]  (Maronick Report at 14.)[6]

20 _____

21     [5] Participants were directed to "CHECK ALL THAT APPLY" and were able to select multiple
responses from the list of responses presented in Question 14.  (Maronick Report at 14; Survey

22 Screenshot, Maronick Report Ex. D, Doc. 152-21 at 35.)

23     [6] On Reply, Sioux Honey submitted the Expert Rebuttal Report of Dr. Bruce Isaacson.
(Isaacson Report, Doc. 162 at 45.)  The Isaacson Report is also a principal basis underlying Sioux

24 Honey's pending *Daubert* Motion to Strike Expert Report of Thomas Maronick.  (Motion to
Strike, Doc. 172.)  In his Report, Dr. Isaacson identifies numerous "extensive flaws" in the

25 Maronick Survey.  (*See generally* Isaacson Report.)  Those flaws include: (1) a narrow scope
focusing on only one of the Sioux Honey Products at issue; (2) a failure to define many of the

26 terms used; (3) the lack of a control group; (4) vague and leading questions; (5) inconsistent
phrasing across questions; and (6) the inclusion of respondents in the Survey population who, for

27 various reasons, should have been excluded.  (*Id.*)  For those reasons, Dr. Isaacson asserts that
Maronick Survey and Maronick Report lack probative value as "reliable measures of consumers'

28

Tran's theory of this case has been consistent:  reasonable consumers would interpret the terms "Pure" and "100% Pure" to mean that the honey cannot contain 41 parts per billion of glyphosate, even if it is the result of the bees' foraging habits and not as a result of the manufacturing process.  Accordingly, this is a case about trace amounts of glyphosate.  Hence, it was incumbent upon Tran to offer evidence that goes to that issue.  However, Maronick's Survey avoided the relevant question.  Rather, Maronick's questions went to the binary issue:  do consumers expect chemicals in a product that is labeled "Pure?"  But the answer to that generic question doesn't advance Tran's theory.  Indeed, at his deposition, Maronick acknowledged that he "wasn't asked to focus on trace amount [sic]."  (Maronick Depo. Tr. at 21:12-22:15, Lenci Reply Decl. Ex. 3, Doc. 162 at 20.)  In short, the Maronick Survey and Report do not provide evidence from which a reasonable factfinder could determine that consumers interpret the term "Pure" to exclude trace amounts of glyphosate.

Tran argues that she does not need to rely on a survey because "'the primary evidence in a false advertising case is the advertising itself'" and "a jury can determine whether advertising is likely to mislead simply by comparing the challenged advertising to what was actually delivered."  (Opp. at 11.)  But in cases like this one, where "the allegedly false word has no fixed meaning," even though not required, survey evidence can be particularly helpful in determining whether a reasonable consumer would be misled by accused labeling.  *See Alvarez v. NBTY, Inc.*, 331 F.R.D. 416, 423 (S.D. Cal. 2019), *reconsideration denied*, No. 17-CV-00567-BAS-BGS, 2020 WL 42767 (S.D. Cal. Jan. 3, 2020) (contrasting cases where consumer understanding of labels is obvious, such as where a label states a product "support[s] healthy hair, skin, and nails," with those where they are less certain, such as where a label indicates a product is "100% natural") (citing

---

understanding of the term 'Pure' when associated with Sue Bee Honey, or of any other issue relevant to this matter."  (*Id.* ¶ 86.)  The Court does not reach those assertions in this Order, as even assuming the admission of Maronick's testimony, Tran fails to provide evidence on a key element in this case.

1   *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 668 (C.D. Cal. 2014)).

2          And regardless of whether survey evidence is required, a plaintiff must nonetheless

3   provide *some* evidence showing satisfaction of the "reasonable consumer" test.  *See*

4   *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 681-82 (2006), *as modified*

5   *on denial of reh'g* (Jan. 31, 2006) (acknowledging that even absent extrinsic or survey

6   evidence, a plaintiff is still required to "show that members of the public are likely to be

7   deceived"); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 507 (S.D. Cal. 2013) (collecting cases)

8   (finding, at the class certification stage, that plaintiffs failed to "sufficiently show that class

9   members would view the presence of the challenged ingredients that are permitted in

10  certified 'organic' foods" as rendering an "All Natural" representation misleading).

11  Absent the Maronick Survey and Report, the only evidence introduced by Tran is her

12  personal view of Products labeled "Pure."  But even that is insufficient, as her own

13  testimony is that "Pure" means "without *added* ingredients or chemicals." (emphasis

14  added) (Tran Depo. Tr. 48:5-11, Richman Decl. Ex. 1, Doc. 152-2.)  Even if that were not

15  the case, Tran offers nothing to show that her view of the labels equates to that of the

16  reasonable consumer.

17          At oral argument, Tran asserted that Survey participants would not understand what

18  is meant by "parts per billion," and Maronick's survey question regarding "chemical

19  residues" suffices to address the issue.  It does not.  As noted above, Maronick

20  acknowledges his survey questions were not meant to answer any questions regarding trace

21  amounts, and nothing in his Report suggests that "chemical residue" satisfies as a stand-in

22  for "trace" amounts.  Nor would that interpretation be supported by the dictionary

23  definition of the terms.  "Residue" is "something that remains after a part is taken," while a

24  "trace" amount indicates "a minute and often barely detectable amount."  Residue,

25  *Miriam-Webster.com* (last visited July 11, 2020); Trace, *Miriam-Webster.com* (last visited

26  July 11, 2020).

27          It would have been simple to present the Survey participants with a question going

28  to whether the participant viewed a honey product containing trace amounts, or 41 parts

13

1  per billion, of glyphosate, as less than "Pure" or "100% Pure."  Maronick did not come
2  close to doing so—instead, the raw Survey data and the Maronick Report offer no
3  foundation upon which a factfinder could conclude that a reasonable consumer would be
4  misled by Sioux Honey's labeling.  Because she lacks evidence of an element necessary to
5  carry her ultimate burden of persuasion at trial as to any of her CLRA, FAL, and UCL
6  claims, each fails.
7
8  IV.   **CONCLUSION**
9        For the foregoing reasons, Sioux Honey's Motion for Summary Judgment is
10 GRANTED.  Sioux Honey shall submit a proposed judgment, consistent with this Order,
11 **within 14 days of the date of this Order**.
12
13
14 DATED: July 13, 2020
15
16                                        HONORABLE JOSEPHINE L. STATON
17                                        UNITED STATES DISTRICT JUDGE
18
19
20
21
22
23
24
25
26
27
28

Appendix

Case 3:17-cv-03529-JLS-SS Document 4-2 Filed 07/13/20 Page 16 of 21 Page 1469
#:3206

Case 3:17-cv-03529-JLS-SS Document 152-21 Filed 03/24/20 Page 32 of 36 PageID #:3206



**Q4**

What type of device are you using to take this survey?

- ○ PC or laptop
- ○ Tablet
- ○ Smart phone
- ○ Other (specify)

Condition: Smart phone Is Selected. Skip To: End of Survey.

Condition: Other (specify) Is Selected. Skip To: End of Survey.

--- Page Break ---

**Q5**

Which of the following, if any, best describes you?

- ○ Primary food shopper for the household
- ○ Share food shopping responsibilities for the household
- ○ Do not participate in food shopping for the household
- ○ Other (specify)

Condition: Do not participate in food ... Is Selected. Skip To: Which of the following, if any, have ....

Condition: Other (specify) Is Selected. Skip To: End of Survey.

--- Page Break ---

**Q6**

Which of the following, if any, have you purchased in the past two months?  [CHECK ALL THAT APPLY]

- ☐ Regular or diet soda
- ☐ Energy drinks (e.g., 5-Hour Energy, Monster, etc.)
- ☐ Frozen diner entres
- ☐ Packaged chicken products
- ☐ Processed honey
- ☐ Individual coffee pods
- ☐ None of the above

Condition: Processed honey Is Selected. Skip To: End of Block.

--- Page Break ---

Case 8:17-cv-00110-JLS-SS Document 152-21 Filed 02/24/20 Page 34 of 34 Page ID #:3208

Q7

Which of the following, if any, do you expect to purchase in the next two months? [CHECK ALL THAT APPLY]

- [ ] Regular or diet soda
- [ ] Energy drinks (e.g., 5-Hour Energy, Monster, etc.)
- [ ] Frozen diner entres
- [ ] Packaged chicken products
- [ ] Processed honey
- [ ] Individual coffee pods
- [ ] None of the above

Condition: Processed honey Is Not Selected. Skip To: End of Survey.

— Page Break —

Add Block

Block 2                                    Block Options ⌄

Q8

Below is a package of honey that you might see in a supermarket or online. Please look at it as you would if you were buying honey for yourself or your family.

— Page Break —

Q9



— Page Break —

Q10    What brand of honey was shown in the image? [PLEASE SPECIFY]

⚙
✳

—— Page Break ——

Q11    What can you tell me about the honey? [PLEASE SPECIFY]

⚙
✳

—— Page Break ——

Q12    Did you see the phrase "Pure Premium Honey" on the label?

⚙     ○ Yes
      ○ No
✳     ○ Don't know/not sure

↺     Condition: Yes Is Not Selected. Skip To: End of Block.

—— Page Break ——

Q13    What does the word "Pure" mean to you when you see it on a label for honey? [PLEASE SPECIFY]

⚙
✳

—— Page Break ——

Q14    Based on what you say on the label, which of the following, if any, reflect your understanding of what "Pure"
       means when you see it on a label for honey. [CHECK ALL THAT APPLY]

⚙     ☐ No additives
      ☐ Nothing artificial
✳     ☐ Made from pure bees
⤪     ☐ Made with no chemicals
      ☐ Nothing but honey
      ☐ No chemical residues
      ☐ Other (specify)
      ☐ Don't know/Not sure

—— Page Break ——

**Q15** How important, if at all, is the term "Pure" in your decision to buy Sue Bee Honey for yourself or our family?

- ○ Extremely important
- ○ Very important
- ○ Moderately important
- ○ Slightly important
- ○ Not at all important
- ○ Don't know/Not sure

— Page Break —

**Q16** How important, if at all, are each of the factors below in your decision to buy Sue Bee Honey for yourself or your family?

|  | Very important | Moderately important | Slightly important | Not at all important | Don't know/Not sure |
|---|---|---|---|---|---|
| Contains no additives | ○ | ○ | ○ | ○ | ○ |
| Made from pure bees | ○ | ○ | ○ | ○ | ○ |
| Made with no chemicals | ○ | ○ | ○ | ○ | ○ |
| Contains nothing but honey | ○ | ○ | ○ | ○ | ○ |
| Sue Bee Honey brand | ○ | ○ | ○ | ○ | ○ |

Add Block

▼ Demographics                                                    Block Options ⌄

**Q17** Gender?

- ○ Male
- ○ Female

— Page Break —

**Q18** Age?

- ○ Under 18
- ○ 18 - 24
- ○ 25 - 34
- ○ 35 - 44
- ○ 45 - 54
- ○ 55 - 64
- ○ 65 or older

— Page Break —

**Q19** Education?

- ○ High school or less
- ○ Some college/technical school
- ○ 2-Yr college degree
- ○ 4-Yr college degree
- ○ Graduate school/degree

Edit Survey | Qualtrics Survey Software

Case 3:17-cv-03119-JES-SS Document 204-2 Filed 07/13/20 Page 21 of 21 PageID 4034
Case 3:17-cv-03119-JES-SS Document 52-1 Filed 03/24/20 Page 21 of 30 PageID
#:3211

Page Break

**Add Block**

⚠ End of Survey                                         Survey Termination Options...

qualtrics XM

Qualtrics.com    Contact Information    Legal